*824 OPINION OF THE COURT
Phillip R. Rumsey, J.
The parties were married on November 24, 1990 after executing a prenuptial agreement three days earlier. During the marriage, they executed two amendments to the agreement, one on November 23, 1994 (first modification), and the second on May 16, 1997 (second modification). In 1998 they separated and, pursuant to the agreement, plaintiff began paying defendant $3,000 per month. Defendant commenced an action for divorce by filing a summons with notice in May 1998, and plaintiff commenced this action for a declaration as to the validity of the prenuptial agreement, and related issues, in September 1998. The divorce summons was apparently not served prior to commencement of this action, but plaintiff was nevertheless aware of the pending action when his initial complaint was drafted.
The parties thereafter reconciled and resumed cohabiting, but neither the pending divorce action nor this one was formally discontinued. In December 2005, while plaintiff was traveling, defendant changed the locks on the marital residence and, upon his return, she informed him that she did not wish to continue living together as husband and wife. Again, plaintiff began paying defendant support payments — this time, at a rate of $4,000 per month, as the prenuptial agreement provided for different levels of support depending on how long the parties had been married when they separated.
On May 4, 2006, plaintiffs counsel sent a proposed separation agreement to defendant’s counsel. After June 2006, plaintiff ceased making support payments to defendant, because the prenuptial agreement provides that upon plaintiff’s tender of a separation agreement that complies with its terms, and the passage of six months from the date of separation, further support need not be paid.
In August 2006, defendant discontinued the divorce action, and, on September 5, 2006, plaintiff filed an amended summons and complaint herein. Defendant answered, contesting the validity of the prenuptial agreement, and counterclaimed for maintenance, and plaintiff replied. After discovery and some motion practice, a nonjury trial was held, after which written submissions were received. Having reviewed the trial proof and written arguments, the court makes the following factual findings and legal conclusions.
When the parties met in 1988, plaintiff was a successful business owner with assets totaling approximately $5 million, and *825 substantial annual income. He owned a chain of home improvement stores, as well as a log home construction business and a travel agency, which together employed about 125 people. He had two children from a prior marriage. Defendant owned a home in Syracuse and a printing business, which she had acquired in conjunction with a prior divorce in 1985. She had five children from her prior marriage, including two sons who are profoundly disabled. After meeting plaintiff, defendant sold her home (the net proceeds of which were under $10,000) and the parties began living together. Defendant’s business was not thriving, and, in early 1990, the business filed for bankruptcy.
The process of bilateral disclosure, negotiation and drafting of the prenuptial agreement began in April 1990, when defendant first consulted with an attorney, and proceeded through the summer and fall. At least a month before signing the agreement, defendant was provided with plaintiff’s tax returns for the prior three years, as well as a financial statement, which detailed the nature and scope of his financial holdings and actual income. She had ample time to consult with counsel, who competently represented her throughout the negotiation period and, ultimately, advised defendant not to sign the agreement that was presented. Nevertheless, she did sign it, against counsel’s advice, apparently because of her concern that plaintiff would refuse to go through with the large wedding that had been planned and was scheduled to occur three days hence.
Having considered all of the relevant circumstances, including defendant’s personal history (e.g., her financial situation, prior divorce, and business experience), the level of disclosure and legal advice provided, the impending wedding, and the terms of the agreement itself, the court finds that the initial prenuptial agreement was not the product of duress or overreaching, nor was it unfair or unreasonable when initially executed (see Cron v Cron, 8 AD3d 186 [2004]). The agreement, before any modification, provided that, upon the dissolution of the parties’ marriage, their property would be distributed in accordance with title — plaintiff would retain assets titled in his name, and defendant would retain assets titled in her name. Assets titled jointly would be split equally. If the parties were to separate for a period of six months, plaintiff agreed to pay any mortgage and tax payments on the marital residence, and to pay defendant a specified sum monthly for “support and maintenance.” The amount of the support payment varied, depending on the length of the marriage. The payments would *826 terminate upon the execution of a separation agreement, the death of either party, or the dissolution of the marriage, whichever came first.
In addition, the payments would cease upon tender by plaintiff of a separation agreement that complied with the provisions of the prenuptial agreement, provided that six months had lapsed since the parties separated. This, as well as the parties’ express agreement to execute a separation agreement “when tendered by either party,” was apparently intended to prevent defendant from unilaterally extending her right to receive support by refusing to sign a separation agreement that effectuated the substantive provisions of the parties’ prenuptial agreement.
The agreement went on to specify that, upon execution of a separation agreement, plaintiff would pay defendant a specified sum, ranging from $100,000 (if the parties had been married less than one year) to $550,000 (if married for 14 or more years). If the parties had been married for more than four years, defendant would also receive the “marital residence.”[1]
Defendant’s first contention is that the agreement constitutes a “contract to dissolve a marriage” within the scope of General Obligations Law § 5-311, and is therefore void. That statute provides, however, that a husband and wife cannot contract to alter or dissolve the marriage, “[ejxcept as provided in [section 236] of the domestic relations law” (id. [emphasis added]). That statute, in turn, permits a contract made “before or during the marriage” that is in writing, subscribed and acknowledged, and provides for, inter alia, the distribution of marital and separate property, and the payment of maintenance or support (as limited by General Obligations Law § 5-311, which prohibits a waiver of maintenance or support by one likely to become a public charge, and by express prohibitions against unreasonable or unconscionable agreements) (Domestic Relations Law § 236 [B] [3] [emphasis added]). While a contractual term expressly requiring the dissolution of marriage may nevertheless be invalid, even if contained in an agreement that otherwise complies with Domestic Relations Law § 236 (see Taft v Taft, 156 AD2d 444, 445 [1989]), the parties’ prenuptial *827 agreement contains no such clause. Although it does compel defendant to “execute a separation agreement” when tendered by plaintiff, the mere execution of such an agreement does not, without more, effect a dissolution of the marriage, or constitute grounds for divorce (see Christian v Christian, 42 NY2d 63, 70 [1977] [“actual basis” of cause of action pursuant to Domestic Relations Law § 170 (6) is the parties’ physical separation, not the execution of an agreement]).[2] Inasmuch as the prenuptial agreement does not require the execution of a separation agreement until such time as the parties are already physically separated, it cannot be said to compel the “alteration” of the marriage in any substantial manner.
While it is clear that the agreement was intended to limit the property that defendant would take away from the marriage upon its dissolution, it was not so one sided as to be plainly unfair or unreasonable when it was executed. It provided for defendant to receive a substantial distributive award, of $100,000 or more, even if the marriage lasted less than one year. If the marriage continued for a longer period — such that defendant could reasonably have expected to share in some of the nonpassive appreciation of plaintiffs separate property, had she sought equitable distribution by a court — her distribution increased. After four years of marriage, she became entitled not only to a distribution of $200,000 (payable over five years), but also to the marital residence, which apparently was valued at approximately $200,000. As the duration of the marriage increased, the agreement provided for a larger distribution. In addition, it provided for defendant to retain any property titled in her name, and also to receive one half the value of any property titled jointly.
Defendant was not a “stay at home” spouse, who toiled without remuneration solely to assist plaintiff in his moneymaking efforts. In addition to keeping a home for plaintiff and otherwise contributing indirectly to his income-producing activities, defendant devoted a large amount of time to raising her children from a prior marriage, and to work she did in plaintiffs businesses, for which she was paid at a reasonable, if not overly *828 generous, rate. The money she made from such work was considered “her money,” and plaintiff did not require that she share it with him or contribute to household expenses (except, perhaps, the expenses of raising her own children). These factors must also be considered when evaluating the fairness of the agreement, on its face, at the time it was made.
Lastly, having received full and honest disclosure of plaintiffs financial situation, and the advice and assistance of competent counsel, and having nevertheless signed the agreement against the advice of counsel, defendant cannot now be heard to complain about its reasonableness at the time it was executed.
Defendant also challenges the validity of the two modifications of the agreement, executed in 1994 and 1997, respectively. The first modification was effected after plaintiff agreed to convey property into a trust for the benefit of defendant’s two disabled sons. As a result of the establishment of the trust and the contribution of funds by plaintiff, a home was constructed for the sons that allowed them to live in comfort, closer to the parties, and outside of an institutional setting. In addition to the construction of the home, funds in the trust (which included rent paid by the State for use of the home to house defendant’s sons) were later used for improvements to it, including a swimming pool. The property was eventually sold to the State, and the trust terminated, at which time the remaining funds were divided among defendant’s three daughters. In exchange for these substantial benefits — which flowed to defendant’s non-marital children immediately, and regardless of whether the parties ever separated — defendant agreed to relinquish her right to the entire marital residence upon a future separation or divorce, instead agreeing to accept one half of the assessed value of a specified piece of property, upon which the parties then intended to construct a new marital home (but in no event less than $100,000). Even if, as defendant’s then-counsel testified at trial, defendant agreed to this modification only because of plaintiffs threat of separation, she nevertheless ratified it by accepting the benefits that flowed to her children over the years after it was signed, without any attempt to rescind it. In addition, when she signed the second modification — with respect to which there was no evidence of any threat, or other undue influence or duress — she expressly reaffirmed and confirmed both the original agreement and the first modification. Defendant cannot now, at this late hour, contend that the first modification should be stricken due to the events surrounding its execution. *829 Nor can the court say that it was objectively unfair or unreasonable at that time.
As for the second modification, it came about after defendant apparently encountered some unexpected difficulty in paying her daughters’ college costs, due to their father’s failure to contribute. Plaintiff agreed to assign to defendant a mortgage obligation that was payable to him, in the total principal amount of $100,000; to personally guarantee payment of that loan; and to pay all taxes on the interest received thereon, in exchange for her agreement to a $100,000 reduction in the amount of the distributive award payable under the original agreement, in the event of a breakup. Again, defendant received a benefit immediately, without condition, in exchange for agreeing to essentially “pay back” the same amount in the future, if the parties were to separate. In addition to this exchange (which, if anything benefitted defendant more than plaintiff), defendant obtained two additional favorable modifications to the agreement: an option to have the distributive award paid out over three years rather than five, if she were to so choose, and the ability to appoint another individual, other than plaintiff, as trustee of the trust set up in connection with the first modification. Considered as a whole, the second modification cannot be deemed unfair or unreasonable in any respect.
Having found no basis for concluding that the original prenuptial agreement, or either of the modifications, was unfair or unreasonable at the time of its execution, and that defendant did not meet her burden of showing that any of the agreements should be disregarded due to overreaching, duress, or undue influence, the court must now consider whether the final agreement (as modified) is now, at the time of its enforcement, unconscionable (Domestic Relations Law § 236 [B] [3]).
An agreement will be deemed unconscionable if it is so unequal in its effect that it “shock[s] the conscience and confound^] the judgment of any [person] of common sense” (Christian at 71). An agreement that provided for the husband to take all of the parties’ property upon divorce — including property brought to the marriage by the wife, and other separate property — unless the wife obtained a written acknowledgment by the husband, within a brief time period of her acquisition of the property, that the property was hers, was deemed unconscionable (Clermont v Clermont, 198 AD2d 631, 633 [1993]), because “[n]o rational person would agree to such an arrangement and no fair and honest person would accept it” (id.). On the other *830 hand, an agreement is not unconscionable merely because it is improvident, or not a good bargain.
Here, plaintiff came to the marriage with $5 million in assets, and several successful businesses. It would be reasonable to assume that, over the next 14 years, if he hadn’t married defendant, his net worth would have grown substantially. He also had two children from a prior marriage, and it would not have been unreasonable for him to desire to preserve the bulk of his wealth for them, which he would have been able to do had he not remarried. Defendant, on the other hand, came to the marriage with little by way of tangible assets, but she did have business skills, training, and experience, which would have enabled her to earn a comfortable living. It would not have been unreasonable for plaintiff to seek to limit any prospective spouse’s recovery in the event of a later separation or divorce, or for defendant to agree to accept a limited amount of support (given her apparent ability to support herself), and a relatively modest distributive award (that would nevertheless, after several years of marriage, grow to an amount far exceeding what she probably could have been expected to save had she not married), as a condition of marriage.
At the present time, after more than 14 years of marriage, the agreement (as modified) provides for defendant to receive $450,000, together with one half the assessed value of the marital residence,[3] which amounts to $123,000, for a total of $573,000, payable over three or five years, at defendant’s election. She is also entitled to one half of a time share property in Cancún (the parties apparently already sold a jointly-owned property in California, and split the proceeds equally), and to keep her horses, a 2007 vehicle valued at over $50,000, and various other property titled in her name (e.g. jewelry). Plaintiff also concedes that defendant is entitled to share equally in the value of his 40IK account, with her share approximating $180,000.
Although plaintiff is, admittedly, a man of considerable means — his assets at the time of trial exceeded $13 million — it must be remembered that he came into the marriage with over $5 million, and with every expectation that his funds would grow, both through passive appreciation and as a result of his own hard work and good management, regardless of whether he *831 married or not. Defendant did not forgo her own money-making opportunities at plaintiffs request, and, when she did work for his businesses, she was paid. During the marriage, defendant devoted a substantial amount of time and energy to raising her own children and advocating for their needs, and to pursuing charitable and other interests. In addition, defendant and her children received substantial benefits from plaintiff, for which she reasonably bargained away some of her rights upon separation. In addition to the funds and assets she will receive under the agreement, she received an additional $100,000 (plus interest) from the assigned mortgage, to pay the college costs for her daughters, and her children received all of the assets placed into the trust, the funds those assets generated in the form of rent and other money from the State, and the intangible benefits of the home built for defendant’s sons.
Considering all of the circumstances, it cannot be said that the agreement, as modified, is “now unconscionable.” Defendant will receive assets valued at over $803,000, plus her share of the Cancún property. She went into this relationship with her “eyes open,” knowing that she would not be entitled to share in all of the wealth generated by plaintiffs business activities during the marriage upon its dissolution. With the distribution she is receiving and the income it will generate, she will be able to maintain a more-than-comfortable lifestyle for many years. It cannot be said that no reasonable person would make such a contract, or no fair and honest person would propose it.
The prenuptial agreement, as modified, is therefore enforceable. It provides for the payment of $4,000 per month to defendant in the event of a separation, with such payments to stop upon tender, by plaintiff, of a separation agreement “in compliance with” the terms of the prenuptial agreement. In May 2006, plaintiff tendered a separation agreement for defendant’s signature. That agreement was not, however, “in compliance with” the prenuptial agreement, because at the time it was proffered, the parties had been married for over 14 years, while the agreement provided for a cash distribution to defendant of only $290,000 — the amount to be paid if the marriage was between eight and nine years’ duration. Plaintiff’s position, as explained at trial, was that because defendant had commenced a divorce action in 1998, which had not been discontinued when the separation agreement was tendered, the parties had only been married for eight years (measured from the date of marriage to the date of commencement of the 1998 divorce action).
*832 Inasmuch as the parties did not specify, in their agreement, how they intended to measure the length of their marriage under these circumstances, the court must look to extrinsic evidence to resolve the ambiguity created by the unusual factual situation, to wit, the pending, but latent, divorce action and intervening seven-year reconciliation. The best evidence of the parties’ intentions, in this regard, is supplied by plaintiff’s actual conduct in paying defendant support, in the months leading up to his tender of the separation agreement, in the amount of $4,000 per month — the sum specified in the agreement as applicable if the marriage was of more than 10 years’ duration. “[T]he practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence” when interpreting that contract (see Old Colony Trust Co. v Omaha, 230 US 100, 118 [1913]; Town of Pelham v City of Mount Vernon, 304 NY 15, 23 [1952]). The court therefore finds, in accordance with plaintiffs own interpretation of the contractual phrase “have been married” as demonstrated by his payment of support at the $4,000 level, that the parties “had been married” for over 14 years when they separated, and therefore that plaintiff never tendered a separation agreement “in compliance with” the prenuptial agreement. That being so, his obligation to pay the monthly support set forth therein was not terminated. Defendant is entitled to recover of plaintiff retroactive support in the amount of $4,000 per month from July 2006 to the present, less any amounts actually paid by defendant during that time, and to continue to receive such support until it is properly terminated as provided in the prenuptial agreement.

. The agreement defined the “marital residence” as the “Sears Pond Residence” (where the parties were residing when it was signed). If, however, the parties were no longer residing there, and the actual value of their residence was less than that of the Sears Pond property, defendant would receive “the then value” of the Sears Pond Residence (but in no event less than $175,000).

. In any event, in light of the agreement’s severability provision, the only rehef to which defendant would be entitled, should she prevail on this argument, would be invalidation of the particular requirement that she execute a separation agreement. The remaining terms of the agreement — including those setting forth the support to be paid upon separation, the events that trigger termination of those payments, and the distribution of property— would still govern.

. Plaintiff concedes that defendant is entitled to one half the assessed value of the current marital residence, rather than the property referred to in the first modification, inasmuch as no home was ever built on that property.